Thank you, Your Honor. May it please the Court, my name is Wendy Holton. I represent Michael Salas in this matter. We have three defendants with, I think, three different, three separate issues here. And so what we've decided is we would divide the time equally about six and a half minutes each. I'd like to reserve about a minute and a half of my time for rebuttal. And since my time is short, I'd like to concentrate on the issue of the upward departure for extreme conduct. As I noted in my briefing, the government was mistaken when it stated that there was no suggestion in the original PSR that an upward departure pursuant to 5K2.8 would be appropriate. In paragraph 305 of the original PSR, that paragraph contains the exact same language as paragraph 178 of the updated PSR, suggesting the potential for an upward departure pursuant to 5K2.8. Significantly, however, there was no suggestion in either the original PSR or on any occasion prior to the second sentencing in the PSR or by any other notice to counsel, or at sentencing for that matter, that an upward departure pursuant to 5K2.2 for bodily injury might be appropriate. Nonetheless, on this appeal, that is, I think, probably the main argument that the government makes, is that that would support the upward departure in this case. Again, we had absolutely no notice of it, and it was not the basis that the district court judge relied on in upward departing. The first time, in fact, in the briefing on appeal, it's the first time that the government has ever even mentioned that. Bodily injury was never mentioned in the PSR. It was never mentioned at the sentencing hearing. It has never come up at all until, and it's certainly not mentioned in the judgment, it didn't come up at all until the government's brief in this appeal. And it's inappropriate at this time to attempt to justify the upward departure on a basis that was never brought up before. Furthermore, and perhaps more importantly, in light of the suggestion in the original PSR that an upward departure for extreme conduct under 5K2.8 might be appropriate, it's significant that in that case, in the original sentencing, the district court judge didn't upward depart. In fact, a review of the judgment, the original judgment in this case, shows explicitly, and the judge says explicitly that he believes that he is sentencing within the guideline range on all but the conspiracy count. But there were other charges, right? Yes. I mean, I think anyone that's appeared before, you know, I mean, judges are kind of looking at, you know, if you want someone to do a certain amount of time, I don't think I'm disclosing anything, but you sort of, you come to that figure in a way that you think is appropriate, and they get those number of years in some ways, and then this went back, right? Right. Because some things got stricken. But in the original sentencing, the judge never said, I think that this might be an appropriate basis, but I think that this is enough time. It was never even mentioned. The judge specifically said, I'm sentencing you within the guideline range, and as for the conspiracy count, I'm downward departing to the statutory maximum. There's no explanation. How many years did he get the first time? He had 240 months the first time. And how many this time? 180. There's no explanation in the original sentencing order or as to why the judge imposed consecutive sentences. But there is also nothing in that original order that would support the argument that he was, he imposed consecutive sentences in order to achieve an upward departure. There's, there's. Is that your argument why he can't do it here? It's, yeah, in part. In part. Because if the facts weren't there then, there was no new evidence presented that would justify the facts now. And in fact, justify the departure now. And in fact, the government's own witness on prostitution, Francis Morgan, his testimony established beyond doubt that as bad as this case is, it is firmly within the heartland of a prostitution case, and particularly a prostitution case where one of the, one of the prostitutes is under the age of 16. Mr. Sallis, in this case, got seven points added to his base offense level because L.B. was less than 16. He got another four points added for physical abuse. That added, just the, just the, the four points for the abuse, which was imposed using almost precisely the same language as the three points for the upward departure, that enhancement in and of itself added between three and four years to an underlying sentence of between seven and eight, seven and eight and a half years. So half again as much was added to the top of that already for the exact same facts. Further, and I think probably going back to the testimony of Francis Morgan, which shows, as I said before, just conclusively, that this case is within the heartland of this type of prostitution cases, there was, the judge made absolutely no indication of what was different about this case, what took it out of the heartland, why those four points weren't adequate to address the issues presented by that case. Because this case is within the heartland, and there is nothing that would distinguish it from other cases of this kind, the case should be remanded for resentencing without the upward departure on the basis of extreme conduct. Excuse me, Ms. Holton. Yes. You started this off with an argument, it seemed to me, that the government was raising issues on appeal it had never raised in the district court. The government suggested in its brief, it said, there was never a suggestion below that the 5K2.8 enhancement would be appropriate. Because we went back on resentencing, and this Court ---- Well, apart from that, I'm looking at the issues you raised in your blue brief on solace. Okay. I don't see anything about this that there were, that there, well, of course, you didn't have, but I guess we'd have to look at your gray brief. Did you in your gray brief then say that the government is raising stuff on appeal that never raised in the district court? Yes, Your Honor. And because there ---- actually, on both of the issues that are raised in this Court. On the first issue, whether on accounts related to K.M., whether he was appropriately enhanced four points for providing her with drugs and alcohol. Yes, but you argued that that's because she used the substance voluntarily and was free to come and go as she pleased. There's nothing about a waiver of this argument or anything in here. No, Your Honor. There isn't, because that was not raised until the government filed its response brief in this case. I'm looking at your gray brief. It's not raised in your gray brief either. You see, the government, you filed your blue brief. Then the government files its arguments in its red brief. Then you get to your reply, and you're not saying, hey, the government never argued this below, and now it's arguing it on appeal. Your Honor ---- But now you're raising it for the first time at oral argument. No, Your Honor. Your Honor, I believe that I raised on both issues, on both the K.M. issue, that the government has raised this issue for the first time in its ---- the issue of whether it was waived for the first time in its response brief. And regarding L.B. and the upward departure, the government has asserted for the first time in its response brief, both that there was no suggestion in the previous PSR that an upward departure might be appropriate and also that the enhancement for bodily injury might be appropriate. Both of those are addressed in my gray brief. Do you basically think your client should have gotten what your client originally got in the stretcher, but just take out the charges that got stricken? I believe that he should have been sentenced within the guideline range. I don't believe that there should have been an upward departure. I believe that the upward departure is inappropriate in this case, as well as the four-point enhancement on the K.M. charges. And with that, I'll resume. It looks like I've taken more than my time. Thank you. Good afternoon, Your Honors. My name is Dan Buckley. I'm the attorney for Kendall Williams. I represented Mr. Williams in the trial on the first appeal and then at resentencing. Our issues are fairly limited. There was a, on the first appeal before this court, the court remanded on the victim vulnerability enhancement for R.K. with particular instructions that upon resentencing, the district court was to look at the relationship between my client and R.K., as well as whether Mr. Williams exploited any particular vulnerability found. On remand, of course, the probation office prepared a new PSR. And in reviewing that PSR, we saw for the first time allegations that have been outlined in the briefs that R.K. had been sexually and physically abused by her mother's boyfriend, a Brent Moore, as well as some more elaboration on the factors that have been included in the first PSR at the first sentencing. The PSR said in almost generalized terms that the defendant, my client, should have known about these or did know about these. These new factors were raised by the government for the first time after this case had gone through a trial, through sentencing, through appeal, and then back down for resentencing. Of course, I brought to the district court's attention that this was the first time we had heard about this, and that most importantly, there is no evidence or indication that my client knew of these additional factors or should have known of these additional factors. And in fact, pointed the court, the district court, and pointed this court in my brief to the trial record where R.K. testified and indicated in response to direct questioning by the government during the trial that they had very little conversation, she and my client, before departing the state of Montana. And in fact, basically the only thing my client knew about R.K. was that she was a runaway, and that was direct testimony elicited by the government. And yet then we get to the second resentencing, and we have a whole new litany of factors, including this Brent Moore allegation that, and despite my objections, the court did, and its sentencing of my client did indicate that my client knew or should have known about these matters, when in fact there is no evidence in the record to support that. If we compare, and this is also before in the briefing, if we compare, there was another victim, S.S., and we could compare her testimony that did support the fact that my client knew about her history and her vulnerability. And in fact, S.S. testified at the trial about that, and S.S. testified that my client made certain promises to S.S. to help her, and so there was a record before this court, before the trial court, on enhancement as it pertained to S.S. It's not the case when we're talking about R.K. There must be a nexus, both when we look at the sentencing guidelines and at the case law, including this court's prior decision in this very case, there must be a nexus between the vulnerability, between the defendant's actions, and the defendant's knowledge. There must be a nexus between those three qualifiers in order to enhance the sentence by the two points. What about the, wasn't it in the facts that while R.K. worked as a prostitute, she and Williams traveled around the country by car? Yes. And that, so they spent some time together? Yes. And that, could the court have concluded that he would have had the opportunity to discover any vulnerabilities during that period of time? I suppose that was a presumption that could have been drawn. I would argue that there must be a preponderance of the evidence and an enhancement under the sentencing guidelines. And there simply is no factual information before, on the record, to support that my client knew of this information. That is a point that occurred to me, too. The indictment talks about luring the persons into prostitution and interstate commerce and all of that on a particular date. And you could argue that there is no evidence in the record to show that as of that date, your client had any knowledge whatsoever of her particular vulnerability. But are we limited to looking at what your client knew or should have known on the date he was charged with committing the crime? Or can we look to what he would have learned over the course of the travel and interstate commerce in that? That's an interesting question because on the original appeal, I argued that having to do with a different issue that we look at the time that the act was committed. And that's where you start your analysis. I think this court, based on this other issue, would probably look to the course of the conduct. In other words, there was a continuing conduct here. In this particular, these two counts went from Montana to New Mexico and then east from there. And in response to your Honor's question, I think it would be the latter, given this court's prior decision. But again, there's just nothing in the record to show that my client knew about these allegations that are in the PSR about Brent Moore or that he knew about R.K.'s specific, the other factors that are discussed in the PSR. The record is actually just the opposite where R.K. testified that we just left Montana without any substantive discussion. I just went with them. And that's her own testimony. And I think it's fair, back to your Honor's question, I think it's fair to assume that if they didn't have any discussion when she hopped into a car with essentially a strange person and drove to New Mexico, why would she then all of a sudden start talking about her life if they even continued after New Mexico? I think there's a fair assumption to be drawn that they didn't have any conversation of any substance. And that's what's troubled me with this record is there's nothing there to show that my defendant knew about these other factors supporting the vulnerability finding. The reloading argument was brought up for the first time on appeal in the government's response brief. Yes, if I can make one final comment with regard to Count 10. Very briefly, it's brief, but it's a very big concern to me that that was segregated out of the grouping because it does have a direct impact on my client's sentence. Thank you. We'll give you a little extra time since you're from Great Falls. Home of the 10th Street Bridge. You know, Jeff Fragerson was instrumental in saving that bridge. You probably know that. Oh, he was. He engineered the settlement between the federal government, the state government and everybody else involved to preserve and save the 10th Street Bridge. And it's there today because of Judge Fragerson. You're not happy about it. You don't like the bridges. I am waiting for them to put a restaurant on there to smell the fumes from the refinery. Oh, the refinery is terrible. I wasn't really. I don't know that this has great historic value, the 9th Street Bridge and the refinery. You know, the 10th Street Bridge, there's a book that depicts America's 100 treasures. And when you open it up, on the left side of this page, there's Edison's Laboratory. On the right side is the 10th Street Bridge. Did you know that? No, I didn't. Talk to Arlene Reichert. She'll tell you. Well, Your Honors, I am June Lord, as I guess you know, and I'm from Great Falls. My client in this case, I didn't do the trial. I represented him on the earlier appeal. And as you will recall, this was started out as this great conspiracy with all these Pinkerton charges. And my position at this time is they used all that Pinkerton information to enhance my client's sentence, two points, for the vulnerable victim. This vulnerable victim was R.K., the same one that was in the Williams case, which, as court ruled, was not out of the beaten path of Man Act victims. Now, when Thompson came along, he was convicted of attempting to recruit her into prostitution. He knew nothing of this. There's nothing in the record that he knew anything about her background. He came with some other person and asked her if she wanted to go to work. And at that time, she was married. She had gone through chemical dependency treatment. She had her life together. So she certainly, even if she were vulnerable at some time in the past, she wasn't when Mr. Thompson contacted her. And there's nothing in the record to say that she was. In fact, everything that was put on the record, sentencing on the remand, was stuff that other people had done to her. Now, Thompson goes by the same standard that Williams had to. He should have known or did know that she was vulnerable for some specific reason. And also, if we follow the Ninth Circuit case in Williams, she would have had a special relationship with him or something like that. She didn't. And as Mr. Buckley mentioned, the reloading concept came up on the remand sentencing. There's no expertise saying what reloading is. There's nothing on the record, no factual evidence concerning that term. I don't know what it means. The government came up with it when it resentenced, when Thompson was resentenced. And the facts just simply do not support the enhancement for vulnerable victim in this case. I would reserve a little time for that. The one that earlier on the case started out as a conspiracy and the government had the Pinkerton theory to use all the conduct by the other people to load on. This defendant. And that was all taken away. So they're stuck with what? Early days of Montana history that Pinkerton's had an effect. I think you're right, Your Honor. The vigilantes days. Place to be. OK, thank you. It plays court. My name is Ed Laws. I'm assistant in Billings, Montana. I was one of the question. Yes, sir. Pardon. You ever a police officer? No, sir. I have been a lawyer, a county attorney, an assistant U.S. attorney. My son, however, is a special agent with customs. So he's the only police officer that we have in the family. Watch you back there when we had this qualified immunity argument. I thought, well, maybe you're the police officer. Maybe arrest. Well, it's I think it's honorable calling your honor. But I didn't choose it. The. The case, the cases here, there are two cases, the Williams case and then the case that involved Salas and Thompson. And these were all heard, I think, on the same day. I did not handle the original appeal. However, the same panel decided both cases. And in both of those cases, the the panel, when it sent back down for resentencing, made very specific references as to what the court had to do. For one thing, when the conspiracy was overturned, that threw out all the Pinkerton counts. And it completely did away with the way the court had grouped the counts in the original sentencing. So the court had to regroup all of those counts and did so. The basically the district court did exactly what this court told it to do. It regrouped those those counts. Also, the the original court noted that in in the case of Salas, that the court had achieved an upward departure by by a consecutive sentence on the conspiracy count. And that was, of course, thrown out. The court also suggested that what the court might want to do in resentencing is to take a look at the extreme conduct. Now, that's where I think Miss Holden says I think she's arguing there was a limited remand. It's finally starting to dawn on me what her argument is. I think that she's saying that because of the opinion of our earlier panel of this court, the district court was somehow or other limited as to what it could look at on the remand. And we're arguing no, it was not. No, I do think it was limited, Your Honor. But I do. But at the same time, I think that this court told the district court on the remand to take a look at the extreme conduct as to Mr. Salas, because it had it had approved the extreme conduct as to Mr. And it dealt with both of those people at the same time. And the court was, I thought, very positive in saying we're taking away your consecutive sentence here of 60 months. But you may want to take a look when this comes back down to you at this extreme conduct for Mr. And gave appropriate notice. And the argument was had as far as that enhancement goes or that upward departure goes. I need for you to articulate for me what facts indicate that Williams knew or should have known of R.K.'s vulnerability. And also what facts support the district court's conclusion that R.K. was particularly vulnerable when she met Thompson? When she met Thompson. Well, I've got two questions there. Okay. The first is what facts indicate that William knew or should have known of R.K.'s vulnerability? Well, first of all. We have what the vulnerabilities were, but how but it's the new or should have known. I don't know if you look at all the facts that the court had the second time around as to R.K.'s background. Those are facts that are very similar to the background of S.S. And that was in Williams. She was found to be a vulnerable victim. The case with Williams, I think you have to look at a little more history of his dealing with R.K. The new or should have known, that's what I'm asking you. What facts indicate he knew or should have known? He was with her for a great deal of time. She escaped from him, went back to Billings, went into drug treatment, and I don't think that that took. He runs into her on the street, drags her into a place called the Crystal Lounge in Billings in front of other pimps who were in there, and tells one of the other pimps, this is my whore and you leave her alone. She then goes back with him. He knew at that point, he knew at that point that she was vulnerable to his advances because of what he had done to her in the past. So whether he knew of her background as far as her mother attempting suicide and all those things, he certainly knew about her drug addiction. He knew that her character was such that she would yield to him. And this is the same thing that happened when Thompson went over to her house. How does that make her different than any other prostitute, I guess? The way you're describing vulnerability, I agree that one can be more vulnerable than others and can meet this criteria. I think it's wrong to say that just because you're a prostitute that everything is endemic to being a prostitute. But when you're showing vulnerability, it has to be more than just what is common to all prostitutes, right? Do you agree with me on that? What the court said in Williams was homelessness, drug addiction, and poverty are not things that you consider. And that was based on the Castaneda case, which in turn was based on the Sabatino case. Okay. And so the fact that, you know, the things about her mother committing suicide, her really troubled youth, all of those things, if that can make her more vulnerable, does Williams still have to know or should have known? Was that a component? Certainly he knew or should have known that her character was such that he could get her to come with him again. And I don't think, although the court hasn't seemed to embrace this, I don't think the reloading concept is a concept that should be foreign to this type of case because it's exactly. You never brought it up before. That's what the court heard. I mean, that would be the first thing that you would be screaming if they did something like that right here. I mean, there are certain rules of the court. I didn't use. You don't like to see things for the first time. I didn't use the term reloading and neither did the court because, frankly, I didn't know the term reloading. But what the court heard in the resentencing on this matter was the entire history of this woman with Williams and then escaping from him, going back with him, escaping again, and then being picked up by yet another pimp and taken around the country. And that was a condition that she was in at the time Thompson came to her. So that is, while I didn't use the, nor did the court use the term reloading, the concept was certainly brought in front of the court and that's exactly what the court did. And what did Thompson know or should have known? Well, Thompson didn't go to this woman out of the clear blue. He went with another pimp by the name of John Salas. And John Salas was something of the guru of the pimps in Billings. So John Salas knew all the history of this woman. And she says, and it says in the presentence report, I can't give you the exact paragraph, but she says, you know, John knew about me. John Salas knew about me. And that's the reason that he and Thompson came over and brought this guy by the name of Sputnik, who was looking for a prostitute and brought him over there to recruit her because they knew that she had been recruited at least three times previously by friends of theirs and had gone out on the circuit with them. So that is, the court did take that into account, all of this background that she had going around the country with these pimps. So it was more than just looking at her poverty and the fact that she was drug addicted and had been trying to get off several times and that she was homeless when Williams first found her. And this is the only, this line of cases is the only situation that I have found where a court has gone outside of the guidelines and looked at the history of the underlying offense. And that is not exactly what the guidelines call on the court to do when you're talking about vulnerability of a victim. The guidelines in... Let me ask you something. If all this is going on at the Crystal Bar and everybody knows about it, why doesn't law enforcement in Billings do something about it? You know, Your Honor, this was a problem that went on for years and it was well known in Billings. And I think that local law enforcement at the time, there was no pimping statute in Montana. Prostitution was a misdemeanor crime and it simply was not worth their going about using up their resources to go after this. The FBI had other things to do and it just simply wasn't procedure, Your Honor, and it should have been. It should have been done a long time before this. We developed a lot of victims that are not mentioned in any of this. We developed a lot of victims who testified in the original trial. We developed a lot of victims who never testified at all. We developed victims who didn't want to testify. But it's been a long-going problem in Billings that is a problem no more as far as street prostitution goes. And it is a shame it wasn't brought up earlier. Your Honor, have I addressed your questions? I don't know if you've satisfied me. You haven't satisfied me. You made an effort to answer my question. Is the Court interested at all in the reloading concept? And I agree that that was not a firm that was. In my mind, you have trouble with that one, in bringing it up at this particular juncture. Okay. Unfortunately, it's one of those things that the facts are confusing me more with each person that I hear from, and that's not good. Well, the only thing I can do is to talk about what the Court originally talked about in Williams. And this Court has approved in three out of four cases. See, I guess what I'm asking you is I thought I told you what you have to show in order to prevail here, and I'm saying give me your best argument. If that was your best argument, then so be it. Well, I think it changes with each defense. I think Williams is a lot more intimately acquainted with R.K., and I think the Court clearly invited the District Court to go back and make some specific rulings regarding that which the District Court did. And the PSR talked about all of her background. That gave her a characteristic, not that he knew all of her background, and he may well have known. He should have known, traveling around the country with her all that time. I made that argument. Well, so did I. But that is true, Your Honor. I mean, that is true. But he should have known. But he knew the characteristic. He was very good. This guy, Kendall Williams, had been doing this since he was 13 years old, and he was very good at carving out those from the herd that he knew were particularly vulnerable, so he could go after them. Predators are very good at that. Pardon? But when you're making certain, predators are very good at that, and I would have no doubt that pimps are very good at finding people that, you know, pimps are not probably going to come up and ask any one person in this courtroom here today to join them. You know, I mean, they know to look for drug people. They know to look for homeless people. But when you're talking about, you know, a vulnerability finding or that someone should or should have known, that's, you know, I think it, you know, I'm looking for facts that go beyond the fact that he's a really good predator. You know, one of the things that I identified was the fact that they traveled around and they spent that time together. Does that, you know, does that sufficiently give rise to the inference? And I asked counsel for the defendant on that, and he had his response. I don't think, Your Honor, that it would be possible for people to be together as much as these were without him having an idea about what her background was. I mean, she just, she was with him every place in the United States over a long period of time, and that would be under the he should have known. Also, the fact that this woman had this background, I don't think that the victim enhancement requires that he know all of the details about her background, but that she had a background that put her in this position is what is needed to come up with a vulnerability for the victim. Almost all of them have that background. That's right, Your Honor, but not all of the entire population has it, and the court in Sabatino and Castaneda that decided this issue went to the 1910 legislative history to take a look at these people. They didn't go to the guidelines, and the guidelines talk about was the vulnerability covered in the offense conduct or the specific conduct under the guideline, and it's not. And it's not. I don't think the courts were correct in those cases that decided that we are going to carve out an exception to women taken into prostitution in Manack cases from all the other cases that come before this court. You don't have cases that carve out a niche for women who are victims of rape on Indian reservations, although I have handled many of those cases, and I can tell you that they have a lot of similarities a lot of times. I think the Sabatino court was just in error the way they pursued this. They got heartland mixed up with adjustments. Well, the whole guideline business is done. I don't think you would find too many district judges nor a whole lot of assistant U.S. attorneys that would disagree with that, Your Honor, but, you know, we have it, and we have to live with it. I never thought they'd last this long because you've got too many vested interests in them. You know, they're more complicated than the Internal Revenue Code. I have to say that it is developing in that direction, Your Honor. We have probation officers that were interested in helping people towards rehabilitation where that was possible. Now all they do is sit around and work the guidelines. Your Honor, let me just sum up by saying that the district court did what it was told to do, and it did it correctly. All of these defendants had their sentences reduced because of the first appeal, and the district judge in reciting these matters acted properly, made the necessary findings. The pre-sentence reports on all of the defendants support the court's conclusion, and the court adopted the pre-sentence report on all of them. And those are set out in a lot more detail in the briefs. I would ask the court to honor the district court's findings as far as this particular victim goes, R.K., and to honor the court's decision on the upward departure because of the extreme conduct of Mr. Souths. I have to, but since you've traveled so far, I hear from the gentlelady from Grayfield. Well, I think the U.S. attorney has pretty much admitted that they didn't have the facts to support enhancement for Thompson. I was just looking at his pre-sentence report, and if you review it, all the facts in there are about the other people and what they did and their contact with this young lady. The only reason Thompson approached her is she was in the business. He didn't approach her because she was vulnerable. He just knew she was in the business, and that's basically what the U.S. attorney has said. So I think that this should be remanded, and he should be resentenced without the vulnerable victim enhancement. Or remanded to take any evidence that might establish knowledge? I wouldn't want to go there. You wouldn't want to do that, of course. I wouldn't want to go there. That occurred to me whether the government should have another shot at it to say, well, you didn't put on any evidence now, but you can have another try at that tool already, I guess. We've had reams and reams of testimony, so I don't think that would accomplish anything. I did notice that in the latest case issued by this court, Case USA or McGill, they found a five-year-old boy in the back of a car, practically passed out. They found that person to be a vulnerable victim. I think that's where that should be. All right. Anybody else? On the second argument, Count 10, my client was, and this had to deal with SS, the other victim in my case, my client's case. The court sentenced under Count 10 to 204 months in prison. I've outlined the procedural reasons why, but I want to urge the court that should the court reverse the victim vulnerability on RK, without the Count 10 being regrouped back into SS, my client still ends up with 204 months. It's a linked issue in that sense. The second final comment I would have is the facts regarding the reloading argument, respectfully, I did not find in the record. And I'll just leave it at that. Thank you. I would like to clarify that what I was facing here was new arguments on both issues that were raised for the first time in appeal. They are addressed in my gray brief. I did not argue, nor do I contend, that this was a limited remand. In fact, that would go against, I think, both the remand order in this case and the general rule of this circuit. What I am arguing, as far as the upward enhancement goes, that with no new evidence presented on the resentencing, the fact that the district court had rejected that previously would indicate that it should not have happened this time. All right. Thank you very much. And for the recess, matter is submitted. Thank you. Thank you.
judges: Pregerson, Thompson, Callahan